THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LISA TERESA S.,[1]
    Plaintiff,

        v.                          Civil No. 3:21-cv-480 (MHL)

KILOLO KIJAKAZI,
Acting Commissioner of the
Social Security Administration,
    Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying Plaintiff's application for a period of disability and disability insurance benefits under the Social Security Act (the "Act"). At the time of her benefits application, Plaintiff was forty-six years old and employed part-time as a program assistant at a non-profit organization. (R. at 146, 169.) She alleges she is unable to work due to post-traumatic stress disorder ("PTSD"), fibromyalgia, Type 2 diabetes, and neuropathy. (R. at 168.)

On February 10, 2021, an Administrative Law Judge ("ALJ") denied Plaintiff's application for benefits. (R. at 12.) After exhausting her administrative remedies, Plaintiff seeks review of the ALJ's decision. This matter now comes before the Court for a Report and Recommendation

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

pursuant to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[2]

Having reviewed the parties' submissions and the record in this case, and for the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 22) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 24) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for a period of disability and disability insurance benefits on September 9, 2019, alleging disability beginning November 1, 2018. (R. at 146.) The SSA initially denied Plaintiff's claims on December 18, 2019, and again upon reconsideration on September 28, 2020. (R. at 90, 98.) Plaintiff requested a hearing before an ALJ, which was held on January 12, 2021, at which Plaintiff appeared with counsel. (R. at 32-58, 105.) On February 10, 2021, the ALJ found Plaintiff not disabled under the Act, and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner. (R. at 1-5, 12.) Plaintiff filed this action seeking judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual

_____

[2] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity ("RFC"), accounting for the most the claimant can do despite her physical and mental limitations. § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her RFC. § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 17-26.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date.[3] (R. at 17.) At step two, the ALJ found that Plaintiff had the following severe impairments: "diabetes mellitus with associated diabetic neuropathy; hypertension; fibromyalgia; asthma, anxiety, [PTSD], depression, and substance abuse in remission." (R. at 18.) The ALJ concluded at step three that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in the regulations. (R. at 18.) Before proceeding to step four, the ALJ assessed

---

[3] Substantial gainful activity is work that is both substantial and gainful as defined in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

Plaintiff's RFC[4] and found that Plaintiff could perform light work, as defined in 20 CFR § 404.1567(b), with the following exceptions:

> [S]he can frequently stoop, kneel, crouch, and crawl; she can occasionally climb ramps and stairs, but never ladders, ropes and scaffolds; she can have occasional exposure to extreme cold, extreme heat, humidity, fumes, odors, dusts, gases, poor ventilation, vibration or hazards; she can frequently handle, finger and feel bilaterally; she can understand, remember and carry out simple, repetitive tasks consistent with unskilled, repetitive work; she can concentrate, persist and maintain pace to complete unskilled, repetitive tasks that do not require production rate pace meaning fast pace; she can have occasional contact with coworkers and no contact with public in settings where tasks involve work primarily with objects rather than people; she can adapt to occasional changes associated with unskilled, repetitive work. She will be off task ten percent of the workday, and miss work one day of work per month.

(R. at 20.)

At step four, the ALJ determined that Plaintiff was unable to perform any past relevant work. (R. at 24.) At step five, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. at 24.) In making her findings, the ALJ considered the testimony of a vocational expert, who opined that given Plaintiff's age, education, work experience, and RFC, she would be able to perform the requirements of representative occupations in the national economy, such as mail clerk, machine tender, and cleaner. (R. at 24-25.) Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act. (R. at 25-26.)

---

[4] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

## IV. ANALYSIS

Plaintiff contends multiple issues warrant remand or, in the alternative, a directed calculation of benefits. (Pl.'s Mem. at 1, 25.) First, Plaintiff asserts that the ALJ erred in her RFC assessment by failing to articulate "the degree to which [Plaintiff]'s physical and psychological impairments would interfere with her work despite finding them severe at Step Two." (Pl.'s Mem. Supp. Summ. J. 11-12 (ECF No. 23) ("Pl.'s Mem.").) Second, Plaintiff contends that the ALJ's decision was "littered with questionable findings of fact that . . . are contradicted by the record." (Pl.'s Mem. at 11-12.) Third, Plaintiff avers the ALJ erred in in finding that Plaintiff had only a moderate limitation in concentration, persistence, and pace. (Pl.'s Mem. at 17-20.) Fourth, Plaintiff challenges the ALJ's decision not to evaluate Plaintiff's Veterans Affairs ("VA") disability rating. (Pl.'s Mem. at 16.)[5] For the reasons set forth below, the Court finds that the ALJ did not err in denying Plaintiff's application for benefits.

### A. The ALJ Did Not Err in her RFC Assessment and Substantial Evidence Supports Her Findings.

Plaintiff makes several arguments related to the RFC findings, arguing first that the ALJ did not consider the degree to which Plaintiff's severe physical and psychological impairments interfered with her ability to work. (Pl.'s Mem. at 12.) Plaintiff reasons that the Fourth Circuit's

---

[5] In addition, Plaintiff briefly alleges that the ALJ failed "to evaluate any of the evidence of [Plaintiff] having [COVID], fail[ed] to evaluate the evidence objectively establishing the existence of serious peripheral neuropathy, and [engaged in] no discussion at all of the apparent decline in [Plaintiff]'s psychological state noted in Exhibit 7F." (Pl.'s Mem. at 20-21.) Plaintiff's failure to develop arguments regarding these contentions waives any claim involving them. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Hughes v. B/E Aerospace, Inc.*, No. 1:12CV717, 2014 U.S. Dist. LEXIS 29535, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do."). Accordingly, the Court will not address these contentions in this Report and Recommendation.

holdings in *Mascio v. Colvin* and *Monroe v. Colvin* are "instructive on this issue" and proceeds to argue specific pieces of evidence that she contends the ALJ either misstated or overlooked when formulating the RFC. (Pl.'s Mem. at 12-16.) Defendant responds that "the present ALJ decision is nothing like the decision in *Mascio*. On the contrary, the present decision provides a proper explanation for the ALJ's factual findings and amply clears the 'not high' bar for substantial evidence." (Def.'s Mem. at 14, citing *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). Plaintiff also challenges the RFC findings by arguing that the ALJ: (1) erroneously afforded no weight to a letter written by Plaintiff's supervisor, Robin Ramsey ("Ms. Ramsey"); and (2) failed to account for Plaintiff's VA disability rating. (Pl.'s Mem. at 11-24.)

The undersigned finds that: (1) the ALJ sufficiently considered and articulated the degree to which Plaintiff's severe impairments interfered with her abilities to perform work-related activities; (2) the ALJ did not err in her representation of the evidence; (3) the ALJ did not err in her evaluation of Ms. Ramsey's letter; and (4) substantial evidence supports the ALJ's findings.

      1. *Legal Standard for the RFC Assessment.*

The process for assessing a claimant's RFC is set forth in Social Security Ruling ("SSR") 96-8P, 1996 SSR LEXIS 5, 1996 WL 374184 (S.S.A.). The ruling sets out in relevant part the following:

> The RFC must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may the RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

1996 SSR LEXIS 5, *2, [WL] at *1. Physical abilities set out in 20 C.F.R. 404.1545(b) and 416.945(b) include sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching. Mental abilities set out in subpart (c) of the regulation include

understanding, remembering, and carrying out instructions, responding appropriately to supervision, coworkers, and work pressures in a work setting. Other abilities set out in subpart (d) of the regulation include those affected by skin impairments or epilepsy, impairment of vision, hearing or other senses, or impairments which impose environmental restrictions.

In *Monroe v. Colvin*, 826 F.3d 176 (4th Cir. 2016), the Fourth Circuit found that the "'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." *Monroe*, 826 F.3d at 187-188 (citing *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96-8P, 1996 SSR LEXIS 5, 61 Fed. Reg. at 34,475 (July 2, 1996)). Only after such a function-by-function analysis may an ALJ express the RFC "'in terms of the exertional levels of work.'" *Monroe*, 826 F.3d at 179 (quoting SSR 96-8P, 1996 SSR LEXIS 5, 61 Fed. Reg. at 34,475).

Expressing the RFC before analyzing a claimant's limitations function by function creates the danger that "the adjudicator [will] overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do." *Id.* at 187 (quoting *Mascio*, 780 F.3d at 636 and SSR 96-8p, 1996 SSR LEXIS 5, 61 Fed. Reg. at 34,476). In addition, the ALJ's assessment "must include a narrative discussion of how the evidence supports each conclusion, citing medical facts and nonmedical evidence, and 'must build an accurate and logical bridge from the evidence to his conclusion.'" *Id.* at 189 (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

### 2. Plaintiff's Medical History.

Plaintiff attended an appointment with her primary care doctor in July 2019 to discuss management of her depression and pain. (R. at 285-88.) Upon assessment, Plaintiff was found to

8

be severely depressed, but reported feeling that her symptoms were "well-controlled" through medication. (R. at 285.) On examination, Plaintiff exhibited good eye contact, appropriate mood and affect, normal insight, and judgment, appeared in no apparent distress, and was "calm, comfortable, attentive and polite." (R. at 287.) She was advised to continue with her medication and follow-up with her psychiatrist. (R. at 287.) Plaintiff returned to her primary care doctor on September 6, 2019 and reported continuing back and leg pain, chronic fatigue, "brain fog," and difficulty falling and staying asleep. (R. at 279, 470.) She was prescribed diabetes medication but stopped taking it because she "read that [it] causes dementia . . . ." (R. at 279.) Plaintiff affirmed that she would take it again after her doctor provided education about its side effects. (R. at 283.) On examination, Plaintiff appeared "fatigued and sad," but had good eye contact, was attentive and calm, and expressed good insight and judgment. (R. at 282.) Her doctor noted that Plaintiff's psychiatrist recommended that she "check into an inpatient for 3 months. She is looking forward to this and hopes to check in within the next 1-2 months. Continues to struggle with feelings of sadness, hopelessness, and lack of interest in things she once found enjoyable." (R. at 279.)

Plaintiff followed up with her psychiatrist, Danielle N. Wroblewski, M.D. ("Dr. Wroblewski"), a few weeks later on September 19, 2019 and discussed residential treatment. (R. at 303.) She relayed that her medications were "helping her stay focused and keep up with the motions of her day to day life." (R. at 304.) On examination, her mood was described as "exhausted mentally," and she had a tearful affect at several times, despite remaining "composed, mildly constricted but overall friendly." (R. at 305-06.) She was "attentive and focused throughout," alert and oriented, and had intact recent memory, and was "open to treatment suggestions." (R. at 306.) She stated that her preference was to keep her medications the same and to pursue therapy, and

her psychiatrist reiterated her support for residential treatment but noted that Plaintiff "can do good work in the meantime in the [outpatient] setting." (R. at 306.)

Plaintiff missed her psychology appointment the next day as well as on September 25, 2019. (R. at 302-303.) She also failed to attend an appointment with Dr. Wroblewski on December 5, 2019. (R. at 368.) She did not see her psychiatrist again until March 2020, when she reported being "fully adherent" to her medication, but that she did not continue with her therapy sessions because she found them unhelpful. (R. at 410.) Plaintiff did not treat at an inpatient facility for financial and employment reasons, and was continuing to struggle with irritation, anger, and feelings of abandonment. (R. at 410-11.) However, she reported that she continued to find her job at a nonprofit "very meaningful" and that her relationship with her partner was going well. (R. at 411.)

On March 3, 2020, Plaintiff attended an appointment with her primary care physician and reported lower back pain, arthritis pain, feet pain and numbness, and bilateral hand pain and numbness. (R. at 464.) Her provider noted that she does not exercise (R. 464). After not eating for most of the day, Plaintiff binges at nighttime. (R. 464.) She endorsed burning, numbness, and tingling in her bilateral feet and hands, and "[did] not check [her] blood sugar out of office." (R. at 464.) She reported good compliance with her diabetes, fibromyalgia, and depression medications, and felt as if her depression was not "under good control, continue[d] to have crying spells," and felt down and "worthless." (R. at 464.) She admitted that she was noncompliant with her counselor's recommendations, and despite her psychiatrist's recommendation that she attend inpatient care, she worried about how she would pay her bills while being out of work. (R. at 463-64.) Plaintiff's physical and psychological examinations were unremarkable, although she "appear[ed] sad, withdrawn." (R. at 467.)

On March 26, 2020, Plaintiff attended a psychology telehealth appointment with Dr. Jamie Trefethen ("Dr. Trefethen") and reported that, while the residential program was "not feasible" for her, she did not engage in recommended group therapy or continue sessions with her therapist. (R. at 398-99.) Plaintiff stated that she smoked marijuana to clear her mind, decrease her anxiety, and improve her appetite, which "has helped her overcome eating disordered behavior." (R. at 399.) At a follow-up session with Dr. Trefethen on April 8, 2020, Plaintiff reported increased panic attacks, anxiety, and frustration related to the COVID-19 pandemic and its potential impact on her son, who was considered an essential worker. (R. at 387-88.) On the same day, she attended an appointment with her primary care provider and reported a cough and shortness of breath. (R. at 461.) She felt as if she had "mucus in her chest but has been unable to cough it up, despite much effort," and was using her albuterol inhaler to "try to 'clear [her] chest.'" (R. at 461.) Her provider prescribed her medication and recommended over-the-counter medicine to alleviate her congestion. (R. at 463.)

Plaintiff failed to attend her mental health follow-up appointments in late April 2020, June 2020, and August 2020. (R. at 384-85, 500.) She next presented via telehealth to her psychiatrist in December 2020. (R. at 490-91.) Plaintiff reported that she missed some of her appointments because she and her partner were sick with COVID-19 symptoms "early in the pandemic" when "testing wasn't available." (R. at 491.) As a result, Plaintiff felt isolated, anxious, "reluctant to leave the house," and paranoid. (R. at 491.) Her provider noted that Plaintiff described "long COVID syndromes" such as shortness of breath, asthma, sleep problems, fatigue, and prominent gastrointestinal issues. (R. at 491.) Plaintiff later agreed to a virtual appointment in February 2021 to resume individual therapy. (R. at 495.)

3. *The ALJ's RFC Assessment.*

The ALJ first found that Plaintiff had the severe impairments of diabetes mellitus with associated diabetic neuropathy, hypertension, fibromyalgia, asthma, anxiety, PTSD, depression, and substance abuse in remission. (R. at 18.) She then discussed Plaintiff's medical history and summarized her subjective complaints, including the testimony she gave at the hearing. (R. 19-24.) In doing so, the ALJ addressed both Plaintiff's psychological and physical impairments. With regards to Plaintiff's physical impairments, the ALJ explained:

> Physical examinations of [Plaintiff] did reveal complaints of diffuse pain, uncontrolled blood sugar readings and occasional hypertension. Otherwise, evaluations were unremarkable, with providers failing to describe abnormalities in her gait, range of motion or strength. In addition, while [Plaintiff] did receive some treatment for her symptoms, this care was quite conservative, consisting mainly of medications that [Plaintiff] only sporadically took. Moreover, no provider recommended that she pursue any more aggressive measures to control her symptoms. Finally, [Plaintiff] was able to work part time, care for her personal needs, do light chores around the house, drive, and shop. Although [Plaintiff's] impairments did cause some pain, the objective findings contained in the record, the conservative care she received, her statements to providers for treatment purposes, and her admitted ability to perform a variety of daily tasks all suggest that this pain was not as severe or as limiting as she claims.

(R. at 21) (internal citations omitted.)

Upon review of the ALJ's decision, it is clear that the ALJ fully considered the medical record, which included Plaintiff's reports to providers about pain. (R. at 21, citing R. at 279.) She noted that Plaintiff controlled her symptoms with medication and did not seek more invasive or "aggressive" treatment. (R. at 21.)

With regards to Plaintiff's mental health impairments, the ALJ noted that Plaintiff reported that she had "trouble following instructions and concentration, and [did] not get along well with others." (R. at 21.) "Although mental status examinations generally show disturbances in her mood

12

and affect, [Plaintiff] has been advised to seek residential and multiple group therapy, she declined those treatment modalities, and often failed to appear for scheduled psychiatry appointments." (R. at 21.) Moreover, the ALJ noted Plaintiff "related symptom improvement when she is taking medication as prescribed," and was able "to engage in a wide range of activities, including working part time, driving, shopping, and doing household chores that require her to sustain concentration, follow instructions, and relate to others." The ALJ concluded that "[t]ogether, this information implies that [Plaintiff]'s mental impairments are not as problematic as she alleges." (R. at 21.)

While Plaintiff contends that the ALJ "never considered the degree to which [Plaintiff]'s physical and psychological impairments would interfere with her work despite finding them severe at Step Two," a review of the record substantiates the ALJ's findings with regards to Plaintiff's physical and psychological complaints and the degree to which they interfere with her ability to do work-related activities.

First, the ALJ referenced Plaintiff's daily activities as just one part of her overall evaluation of Plaintiff's subjective complaints, noting that "she works part time as a program assistant" and is "scheduled to work five hours per day, four days per week." (R. at 21.) While at work, Plaintiff "talks to people on the phone and coordinates getting them medical equipment." (R. at 21.) In addition to part time work, Plaintiff "drives, cares independently for her personal needs and takes care of her dog. She visits with her mother and partner. She goes grocery shopping and does household chores such as laundry." (R. at 21.)

In addition to Plaintiff's activities of daily living, the ALJ noted that the objective evidence did not fully support Plaintiff's statements about the extent of her limitations. (R. at 21.) For instance, the ALJ noted that Plaintiff's physical examinations revealed "complaints of diffuse pain, uncontrolled blood sugar readings, and occasional hypertension. Otherwise, evaluations were

unremarkable, with providers failing to describe abnormalities in her gait, range of motion or strength." (R. at 21) (internal citations omitted.) In addition to the objective findings, the ALJ summarized Plaintiff's treatment notes, finding that "this care was quite conservative, consisting mainly of medications that [Plaintiff] only sporadically took[.]" (R. at 21.) "Moreover, no provider recommended that [Plaintiff] pursue any more aggressive measures to control her symptoms." (R. at 21) (internal citations omitted.)

The ALJ also considered the medical opinion evidence. She found the state agency physicians' opinions to be "only partially persuasive" because they failed to account for Plaintiff's restrictions in "manipulations with the upper extremities" and the environmental limitation that she "avoid working around" respiratory irritants. (R. at 23.) The ALJ also evaluated the state agency psychologists' opinions and found them "partially persuasive" because they were supported by their narratives and consistent with the remainder of the medical evidence, but "did not define what they meant by additional breaks . . . ." (R. at 23.) In doing so, the ALJ appropriately assessed the medical opinion evidence in accordance with the regulations and considered their assessments when evaluating Plaintiff's subjective complaints.

Finally, the ALJ considered a letter submitted by Plaintiff's supervisor, Ms. Ramsey. (R. at 23, citing R. at 218-220.) According to the ALJ, Ms. Ramsey opined that Plaintiff was "unable to work 20 hours or more per week as it would be detrimental to her mental, emotional, cognitive and physical health." (R. at 23.) The ALJ noted "[w]hile Ms. Ramsey did not offer this opinion in a treatment capacity, she is a third party individual offering insight into [Plaintiff]'s abilities." (R. at 23.) Noting that Ms. Ramsey "supported her opinion with her narrative in her statement," the ALJ determined that it "is not completely consistent with the remainder of the medical evidence." (R. at 23.) Moreover, the ALJ reasoned the RFC accounted for many of the limitations described

14

by Ms. Ramsey, which included Plaintiff's "need to be limited to unskilled job tasks not performed at a production pace rate and not requiring more than occasional social contact, and that allow for additional time off task and absences as indicated." (R. at 23-24.) The ALJ added that the "part-time work that [Plaintiff] performs at the Foundation for Rehabilitation exceeds her [RFC] as assessed herein." (R. at 24.) In finding Ms. Ramsey's opinions "not generally persuasive," the ALJ remarked that "observations and opinions are considered, they are not expressed in vocationally relevant terms nor in the capacity of a healthcare provider." (R. at 24.)

According to Plaintiff, the ALJ "gave these letters no weight" solely on the grounds that "they weren't medical correspondence or expressed in 'vocationally relevant terms.'" (Pl.'s Mem. at 15, citing R. at 24.) Plaintiff adds that "this is a third party report from [Plaintiff]'s employer and the ALJ does not give it weight despite there being absolutely no document in the record that contradicts the assertions" contained in Ms. Ramsey's letter. (Pl.'s Mem. at 15.) The undersigned finds that the ALJ's analysis of that letter is not as cursory as Plaintiff alleges. In fact, the ALJ specifically pointed to Ms. Ramsey's letter and wrote that she considered Ms. Ramsey's observations and opinions, but the ALJ provided reasons, backed by substantial evidence, to partially discount it. Among those reasons were the ALJ's finding that Ms. Ramsey's opinion was not entirely consistent with the remainder of the medical evidence. (R. at 23.) Further, the ALJ noted that Ms. Ramsey "essentially describes a sheltered or supported work environment and suggests that [Plaintiff] is not performing in a competitive manner. However, the undersigned has allowed for limitations consistent with [Plaintiff's] functional capacity . . . ." (R. at 23.)

Plaintiff's first contention is that the ALJ erred by dismissing Ms. Ramsey's entire letter on the grounds that it was not medical correspondence and failed to use vocationally relevant

terms. This Court finds that the ALJ did not ignore or dismiss the letter. Instead, the ALJ articulated many reasons, supported by substantial evidence, for partially discounting Ms. Ramsey's letter.

Plaintiff's second contention is that the ALJ erred by dismissing Ms. Ramsey's letter when "absolutely no document in the record [] contradicts [it]." (Pl.'s Mem. at 15.) However, Plaintiff's argument appears to be an invitation for this Court to re-weigh the evidence that has already been considered and weighed by the ALJ. This Court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Craig v. Chater*, 76 F.3d, 585, 589 (4th Cir. 1996.)

**B.  The ALJ Did Not Err in Her Evaluation of the Evidence of Record.**

*1.  Standard of Review.*

While the Court is "authorized to review the [SSA]'s denial of benefits under 42 U.S.C.A. § 405(g)," it does not conduct a *de novo* review of the evidence. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (citation omitted). Instead, the Court's review of an SSA decision is deferential, as "[t]he findings of the [SSA] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); *see Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996) ("The duty to resolve conflicts in the evidence rests with the ALJ, not with a reviewing court."); *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986) ("We do not conduct a *de novo* review of the evidence, and the [SSA]'s finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." (citations omitted)).

Therefore, the issue before the reviewing court is not whether a claimant is disabled, but whether the ALJ's finding that a claimant is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 267 (4th Cir. 2017) ("[A] reviewing court must uphold the [disability]

determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." (citation and internal quotation marks omitted)).

   *2. The ALJ Did Not Mischaracterize or Erroneously Evaluate the Evidence.*

   With this standard of review in mind, the Court turns to Plaintiff's assertions that the ALJ's review of the record resulted in "questionable findings of fact" that are "contradicted by both [Plaintiff]'s testimony and the record." (Pl.'s Mem. at 13.) For instance, Plaintiff takes issue with the ALJ's characterization that Plaintiff took medications "sporadically." (Pl.'s Mem. at 22.) In response, Defendant notes that the treatment records cited by both Plaintiff and the ALJ reflect that Plaintiff voluntarily stopped taking Metformin, a diabetes-controlling medication, because she feared it would lead to dementia. (Pl.'s Mem. at 12-13; Def.'s Mem. at 15; R. at 22.) As a result, Plaintiff's contention that the ALJ should have found in her favor, despite evidence in the record supporting the ALJ's findings, is an issue outside of this Court's scope of review.

   Likewise, Plaintiff contends that the ALJ mischaracterized the evidence by noting that Plaintiff "goes grocery shopping" without specifying that Plaintiff shops online and accompanies her mother on the car ride to the store. (Pl.'s Mem. at 13-14.) The ALJ did not specify how Plaintiff shops, noting that she "goes grocery shopping" and is able to engage in a wide range of daily activities, including "shopping[.]" (R. at 21.) Notably, the ALJ included a number of other examples of activities of daily living that support her credibility findings. (R. at 21.) For example, the ALJ found that Plaintiff worked part time, cared for her personal needs, took care of her dog, visited with her mother and partner, and did household chores, such as laundry. (R. at 21.) While the ALJ could have been more specific with regards to the kind of shopping, or the extent to which Plaintiff shops, the ALJ gave other examples to support her finding that Plaintiff's impairments were not as severe or as limiting as she claimed. Moreover, it is not for this Court to "undertake to

re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro*, 270 F.3d at 176.

In another instance, Plaintiff argues that the ALJ failed to analyze or discuss the ALJ's testimony regarding Plaintiff's time off task or absenteeism. (Pl.'s Mem. at 15.) In support, Plaintiff alleges that the ALJ should have reconciled Plaintiff's testimony that she would be absent six to ten days per month with the vocational expert's testimony that an employee who missed work two days or more per month is "not engaging in competitive employment." (Pl.'s Mem. at 15.) However, as discussed above, the ALJ's review of the record and her credibility determinations are supported by substantial evidence, and the undersigned declines to re-weigh the evidence in her favor.

The ALJ's findings were accompanied by a thorough review and assessment of the entire record. This "assessment . . . provides a backdrop for the ALJ's evaluation[s] . . . and provides insight into [them]." *Worden v. Astrue*, 2012 U.S. Dist. LEXIS 98887, 2012 WL 2919923, *5 (E.D.N.C. 2012), *Report and Recommendation Adopted*, 2012 U.S. Dist. LEXIS 98893, 2012 WL 2920289. Upon review of the record, the ALJ's opinion was thorough and applied the proper legal standard. *See Ladda v. Berryhill*, 749 Fed. App'x. 166 (4th Cir. Oct. 18, 2018) (upholding the ALJ's credibility determination because the ALJ explained his reasoning and weighed the claimant's subjective statements against other evidence.) Moreover, the ALJ's determinations were supported by substantial evidence.

## C. The ALJ Appropriately Accounted for Plaintiff's Moderate Limitation in Concentration, Persistence, or Pace and Did Not Err When Evaluating the Medical Opinion Evidence.

Plaintiff next alleges that the RFC formulated by the ALJ fails to properly account for Plaintiff's moderate limitation in concentrating, persisting, or maintaining pace. (Pl.'s Mem. at 20.) Plaintiff relies upon *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) and *Thomas v.*

*Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019), to support her assertion that the ALJ did not adequately address her moderate impairment with concentration, persistence, or pace when the ALJ restricted the type of tasks Plaintiff can perform ("unskilled, repetitive tasks that do not require production rate pace meaning fast pace"), or define "production rate pace." (Pl.'s Mem. at 17-20.) Moreover, Plaintiff contends the ALJ failed to reconcile her findings with the opinions of the state agency psychologists who determined that Plaintiff required additional, unscheduled breaks during the workday. (Pl.'s Mem. at 19.) Defendant responds that the RFC appropriately accounts for Plaintiff's moderate limitation in this area of functioning, and the ALJ sufficiently explained her consideration of the medical opinion evidence regarding Plaintiff's time off-task and missed work. (Def.'s Mem. at 21.) Additionally, Defendant notes that the "ALJ's decision was entirely consistent with the Fourth Circuit's directive in *Mascio*" as it contained "numerous additional limitations" that adequately accounted for Plaintiff's ability to concentrate, persist, or maintain pace. (Def.'s Mem. at 23-24.)

1. *The ALJ's Finding that Plaintiff Had a Moderate Limitation in Concentrating, Persisting, or Maintaining Pace is Supported by Substantial Evidence.*

At step three of the sequential analysis, the ALJ determined that Plaintiff had a moderate limitation with regard to concentrating, persisting, or maintaining pace. (R. at 19.) Specifically, the ALJ noted Plaintiff's reported mood abnormalities, increased isolation, and deficits in concentration "on occasion due to her mental impairments." (R. at 19.)

The ALJ cited to Plaintiff's mental health counseling notes, which documented Plaintiff's reports of anxiety, depression, and hypervigilance. (R. at 22, citing R. at 236.) Indeed, the records indicate Plaintiff's safety-seeking behaviors, such as carrying a knife and checking door locks, or worrying about someone harming her or her granddaughter. (R. at 22, citing R. at 48, 51, 232-33.) The ALJ noted that Plaintiff's diagnoses (depressive disorder, anxiety disorder, and PTSD)

"prevent her from performing complex, fast-paced work activities . . . ." (R. at 22.) The ALJ summarized Plaintiff's reported ongoing symptoms, "including tearfulness, periods of anxiety, trouble concentrating, difficulty sleeping, and passive suicidal ideation," as well as "daily marijuana use for anxiety, and a history of alcohol abuse." (R. at 22, citing R. at 39, 236.) Additionally, the ALJ considered Plaintiff's mental status examinations, which showed, generally, "disturbances in her mood and affect . . . ." However, the ALJ explained that Plaintiff "related symptom improvement when she is taking medication as prescribed," and was "able to engage in a wide range of daily activities, including working part time, driving, shopping, and doing household chores that require her to sustain concentration, follow instructions, and relate to others." (R. at 21.) The ALJ reasoned that "this information implies that the claimant's mental impairments are not as problematic as she alleges." (R. at 21.)

The ALJ summarized Plaintiff's hearing testimony regarding her ability to concentrate, persist, or maintain pace. (R. at 21.) Plaintiff testified at her hearing that she can drive herself to work, open up her computer, check emails, print out applications, and call customers to update them or ask questions. (R. at 43.) She described taking her dog out, making "sure that he's taken care of," and watching the news on television. (R. at 43.) She told the ALJ that she shops online for groceries, does her laundry "once every two weeks," and manages her own medication. (R. at 43-44.) Despite describing her employer as being "very good for [her]," Plaintiff reported that it was difficult for her to go to work and estimated that she missed two or three days a week. (R. at 47.) She attributed this to her difficulty in "deal[ing] with certain people," namely, men, and in particular having trust issues with authority figures as a result of her PTSD. (R. at 47.) She also testified about having panic attacks twice a week, experiencing night terrors, and needing to leave work early "about five times a month." (R. at 46, 48, 50.)

The ALJ reviewed the medical opinion evidence relating to Plaintiff's impairments. On December 13, 2019, state agency physician Howard S. Leizer, Ph.D. ("Dr. Leizer"), reviewed Plaintiff's records and determined that she was moderately limited in her ability to concentrate, persist, or maintain pace. (R. at 65.) In particular, he specified that she was moderately limited in her ability to: (1) carry out detailed instructions; (2) perform activities within a schedule; (3) maintain regular attendance; (4) be punctual; (5) complete a normal workday and workweek without interruptions from psychologically based symptoms; and (6) to perform at a consistent pace with an unreasonable number and length of rest periods. (R. at 68.) Dr. Leizer concluded, "[b]ased on the overall evidence [Plaintiff] is capable of performing simple, repetitive work." (R. at 68-69.) On September 26, 2020, state agency physician Richard J. Milan, Jr., Ph.D. ("Dr. Milan"), reviewed Plaintiff's records upon reconsideration and agreed with Dr. Leizer's findings. (R. at 80-86.) Dr. Milan added that Plaintiff "would need more unscheduled breaks than the average employee but not to such an extent as to preclude competitive employment." (R. at 84.)

The ALJ reviewed the opinions of Dr. Leizer and Dr. Milan and found them "partially persuasive" because they "supported their opinions with their narratives, and they are somewhat consistent with the remainder of the medical evidence." (R. at 23.) The ALJ noted that, while the evaluators "did not define what they meant by additional breaks," she nonetheless provided for off-task and missed work limitations in the RFC to "provide for this limitation, but would not be to the extent to preclude competitive employment." (R. at 23.)

The ALJ determined that Plaintiff had a moderate limitation in concentrating, persisting, or maintaining pace, explaining:

> [Plaintiff's] mood abnormalities persist, and she reports increased isolation, particularly due to the pandemic. This would likely impact her ability to persist and maintain pace. While her concentration is generally noted to be within normal limits, she likely has deficits in

21

> concentration on occasion due to her mental impairments. However, she is able to shop, drive, work part time and do some household chores. These activities require her to concentrate, persist and maintain pace as needed, and suggest no more than a moderate limitation in this domain.

(R. at 19.) In the RFC, the ALJ further noted, in relevant part, that Plaintiff:

> [C]an concentrate, persist and maintain pace to complete unskilled, repetitive tasks that do not require production rate pace meaning fast pace; she can have occasional contact with coworkers and no contact with public in settings where tasks involve work primarily with objects rather than people . . . . She will be off task ten percent of the workday, and miss work one day of work per month.

(R. at 20.)

### 2. The ALJ Did Not Err When She Articulated Plaintiff's Limitation in Concentrating, Persisting, or Maintaining Pace in the RFC.

In *Mascio*, the Fourth Circuit held that "an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" 780 F.3d at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). The Fourth Circuit emphasized the distinction between the ability to perform simple tasks and the ability to stay on task, stating that "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* Although the Fourth Circuit noted that the ALJ's error might have been cured by an explanation as to why the claimant's moderate difficulties in concentration, persistence, or pace did not translate into a limitation in the claimant's RFC, it held that without such an explanation, remand was necessary. *Id.*

Likewise, in *Shinaberry v. Saul*, the Fourth Circuit clarified that an "ALJ cannot summarily 'account for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform simple tasks differs from the ability to stay on task.'" *Shinaberry v. Saul*, 952 F.3d 113, 121 (4th

22

Cir. 2020) (quoting *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015)). However, there is no "categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." *Id.* In contrast, *Shinaberry* highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." *Id.* (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)).

In *Thomas v. Berryhill*, 916 F.3d 307 (4th Cir. 2019), the Court held that an RFC stating that the claimant could not perform work "requiring a production rate or demand pace," was inadequate to address a moderate impairment with concentration, persistence, or pace because the ALJ failed to provide information to understand what those terms mean. *Id.* at *3. The Court stated,

> Without further explanation, we simply cannot tell whether the RFC finding – particularly the portion restricting [the claimant] to jobs that do not require a "production rate" or "demand pace" – properly accounts for [the claimant's] moderate limitations in concentration, persistence, and pace. On remand, the ALJ will need to establish for how long, and under what conditions, [the claimant] is able "to focus [her] attention on work activities and stay on task at a sustained rate." Only then will we or any court be able to meaningfully review the ALJ's RFC finding.

*Id.* at 4, n. 5. The Court in *Thomas* also found error because the ALJ did not draw "explicit conclusions about how [the claimant's] mental limitations affect her ability to perform job-related tasks for a full workday- a benchmark established by the [SSA's] own regulations." *Id.* at 3.

In *Perry v. Berryhill*, No. 18-1076, 765 Fed. Appx. 869, 2019 WL 1092627, at *3 (4th Cir. March 8, 2019), the Court reiterated its holding that a moderate limitation with concentration, persistence or pace is not accounted for by limiting a claimant to "unskilled work." The Court further stated:

> [i]f those limitations are addressed at all, that is, then it must be
> through the ALJ's reference to a "non-production-oriented work
> setting." But, again, we do not know what the ALJ intended when
> she used that phrase. As a result, it is difficult, if not impossible, to
> evaluate whether restricting [claimant] to a "non-production-
> oriented work setting" properly accounted for claimant's well-
> documented limitations in concentration, persistence, and pace.

*Id.*

Here, the ALJ discussed Plaintiff's mental health symptoms, her treatment, and the state agency opinions in the record. The ALJ determined that Plaintiff had moderate impairments with concentration, persistence, or pace, which is supported by Plaintiff's mental health records, her testimony, and the state agency opinions in the record. Unlike the ALJs in *Perry* and *Thomas*, the ALJ in the present matter sufficiently explained what she meant by "production rate pace" by defining it as "fast pace," and gave reasons to support this mental limitation that addressed Plaintiff's ability to perform a task at a certain pace for an eight-hour day. (R. at 20.) Consistent with the *Mascio* ruling, the ALJ addressed Plaintiff's ability to stay on task when accounting for her limitations in concentrating, persisting, and maintaining pace. (R. at 20.) Moreover, the ALJ explained how the evidence in the record translated to limitations that were subsequently accommodated by the RFC. Thus, the ALJ built a logical bridge between her finding that Plaintiff had a moderate impairment with concentration, persistence or pace and her conclusion that Plaintiff could perform light work "at a production rate pace meaning fast pace" while being "off task ten percent of the workday" and absent "one day of work per month." (R. at 20.)

3. *The ALJ Did Not Err in Evaluating the Medical Opinion Evidence.*

Plaintiff argues briefly that the ALJ did not address the "treating source opinion" of Plaintiff's treating psychiatrist, Dr. Wroblewski. (Pl.'s Mem. at 13.) While ALJs must articulate how persuasive they find the medical opinions, the ALJ in the present matter was not obligated to

address Dr. Wroblewski's treatment notes because they do not constitute a "medical opinion" under the regulations. *See* § 404.1513(a)(2) ("A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the [enumerated work-related] abilities.").) A medical opinion does not include "judgments about the nature and severity of [the claimant's] impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." § 404.1513(a)(3). The regulations put such evidence in the category of "other medical evidence" as opposed to "medical opinion." While the regulations impose articulative duties pertaining to medical opinions on the ALJ, they do not impose such duties with respect to other medical evidence. *See* §§ 404.1513(a), 404.1520c.

With this definition in mind, the Court turns to Dr. Wroblewski's treatment notes. The information on which Plaintiff seeks to rely – such as mere observations and Plaintiff's recorded subjective complaints during office visits – contains no medical judgment, which is the essence of medical opinions. Many documents Plaintiff cites merely record the symptoms Plaintiff has reported feeling and state past diagnoses, among other information. But these recitations need not be given dispositive weight. Because the ALJ need only evaluate and attribute weight to a treating doctor's medical opinions, there was no reversible error in failing to assign weight to this medical evidence.

Notwithstanding, the ALJ specifically cited to the treatment notes identified by Plaintiff throughout her written decision, demonstrating that she accounted for the evidence contained in them and considered Dr. Wroblewski's notations when evaluating Plaintiff's claim. *See* (R. at 21, 22 (citing to Ex. 1F).) To the extent that Plaintiff argues that the state agency physicians did not "reference[] Dr. Wroblewski's opinion," the record demonstrates that the VA medical treatment

notes were received prior to the completion of the medical evaluations by both Dr. Leizer, at the initial determination level, and Dr. Milan, at the reconsideration level. *See* (R. at 60-63, 75-79.) Plaintiff's argument that the ALJ's reliance on the state agency physicians' opinions was flawed, in part, because it was based on "missing opinion evidence," is unavailing. (Pl.'s Mem. at 19.) Therefore, the Court finds that the ALJ did not err in her evaluation of the medical opinion evidence, and substantial evidence supports her findings as to Plaintiff's moderate limitation in concentration, persistence, or pace.

## D. The ALJ Complied with the Applicable SSA Regulations Concerning Plaintiff's Disability Rating from the VA.

Plaintiff contends that the ALJ "failed to offer good reasons tied to the evidence of record to not discuss the VA rating other than mentioning [Plaintiff] is on VA disability without discussing the rating is not supported by substantial evidence." (Pl.'s Mem. at 16.) In support, Plaintiff argues that the ALJ's decision was in contravention of the Fourth Circuit's holding in *Bird v. Commissioner*, 699 F.3d 337, 342 (4th Cir. 2012). (Pl.'s Mem. at 16.) In response, Defendant contends that 20 C.F.R. § 404.1504 instructs that the ALJ "not provide any analysis" of such decision but only consider the decision's "underlying evidence." (Def.'s Mem. at 19.) Accordingly, the ALJ "correctly declined to consider Plaintiff's VA disability" and "complied with the applicable regulations by discussing the relevant VA medical evidence that related to Plaintiff's disability rating." (Def.'s Mem. at 20.) Moreover, Defendant argues that Plaintiff cannot rely on *Bird* because that case applied regulations that were effective before March 27, 2017. (Def.'s Mem. at 18.)

For claims filed on or after March 27, 2017,[6] § 404.1504 governs how the Commissioner considers disability and other administrative decisions – including decisions by the VA – when determining a claimant's entitlement to disability benefits. In relevant part, the regulation states:

> Because a decision by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules. Therefore, . . . we will not provide any analysis in our determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits. However, we will consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that we receive as evidence in your claim in accordance with § 404.1513(a)(1) through (4).

§ 404.1504.

The ALJ did not err in refusing to consider the VA's disability determination. Under § 404.1504, the VA's decision was "not binding," and the ALJ was not required to "provide any analysis" about the VA's decision. Plaintiff nonetheless argues that the ALJ should have considered the VA disability rating, relying on the Fourth Circuit's decision in *Bird v. Commissioner*. In *Bird*, the Fourth Circuit held that an ALJ must give "substantial weight" to a disability determination rendered by the VA, unless the administrative record "clearly demonstrates" a deviation from that VA decision. 699 F.3d at 343. *Bird*, however, relied on SSR No. 06-03p, 2006 SSR LEXIS 5, which stated that another administrative agency's disability determination "cannot be ignored and must be considered" by an ALJ. *Bird*, 690 F.3d at 343 (quoting SSR No. 06-03p, 2006 SSR LEXIS 5, at *17). As Defendant notes, that SSR was rescinded on March 27, 2017. Rescission of Social Security Rulings, 82 Fed. Reg. 15263

---

[6] Plaintiff filed her application on September 6, 2019. (R. at 146.)

27

("[A]djudicators will not provide any articulation about their consideration of decisions from other governmental agencies . . . because this evidence is inherently neither valuable nor persuasive to us."). The *Bird* analysis is therefore not applicable to claims filed after March 27, 2017, which includes Plaintiff's application filed on November 19, 2018.

Plaintiff's argument that *Bird* is applicable to her claim was explicitly rejected in *Yonnes S. v. Saul*, No. 1:20CV0819, 2021 U.S. Dist. LEXIS 64989, 2021 WL 2767298 (E.D. Va. Mar. 31, 2021). There, the claimant argued that the ALJ erred in refusing to consider Plaintiff's VA disability determination, relying on both 20 C.F.R. § 404.1520c and *Bird*. *Yonnes S.*, 2021 U.S. Dist. LEXIS 64989, 2021 WL 2767298, at *8. This Court rejected Plaintiff's arguments, using the same reasoning as described above. 2021 U.S. Dist. LEXIS 64989, [WL] at *8-*9. Because § 404.1504 prohibits an ALJ from considering a disability determination by another administrative agency, the ALJ did not err in failing to consider Plaintiff's disability determination by the VA.

### V. CONCLUSION

For the reasons set forth above, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 22) be DENIED, Defendant's Motion for Summary Judgment (ECF No. 24) be GRANTED, and the final decision of the Commissioner be AFFIRMED.

Let the Clerk file a copy of this Report and Recommendation electronically, notify all counsel of record and forward a copy to United States District Judge M. Hannah Lauck.

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

/s/ MRC

Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: July 26, 2022

29